Filed 7/1/16  In re Ella S. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re ELLA S., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. A.S., Defendant and Appellant. | A146104 (Alameda County Super. Ct. No. OJ0700793501) |

Ella S., now 11 years old, was removed from her mother's custody at age three and placed with Kim M., who became her legal guardian.  Appellant, Ella's maternal grandfather, first learned of the child's existence when she was five years old and has been seeking to have her placed with him ever since.  The present appeal is from the denial of appellant's petition to set aside the existing guardianship and place Ella in his home.  We affirm.

**STATEMENT OF THE CASE AND FACTS**

When Ella was removed from her mother's custody in September 2007, there were no known relatives available for placement.[1]  After she was declared a dependent and the

---

[1] Much of our description of the history of this case from its inception until the fall of 2014 will repeat the description set forth in our unpublished opinion on a prior appeal. (*In re Ella S.* (Aug. 27, 2015, A143338) 2015 WL 5062467.)

mother's reunification services were terminated, the court initially ordered a permanent plan of legal guardianship. Then, when the mother stopped visiting, the court set aside the guardianship order in favor of a plan of adoption. Appellant learned that Ella existed when the Alameda County Social Services Agency (Agency), attempting to locate and serve the mother with notice of a Welfare and Institutions Code[2] section 366.26 hearing set for December 2009, mailed letters to the mother's parents. Appellant responded by seeking visitation and placement of the child with him.

After several weeks of what appellant felt was the Agency discouraging him from coming forward, he had his first visit with Ella. As time went on, Ella had frequent visits with appellant and other maternal relatives. Kim was supportive of Ella getting to know the relatives; because of the introduction of the family, she felt uncomfortable about proceeding with the adoption and decided to pursue a legal guardianship instead. By the end of June 2010, the Agency reported that Ella had established a strong relationship with appellant but that moving her from the placement with Kim after almost three years would be "absolutely devastating." Letters of guardianship were issued to Kim in September 2010. By February 2011, Ella was reported to have been fully integrated into Kim's home and very happy there. She had been spending three to four weekends a month with appellant, who expressed interest in having her placed with him at some point in the future.

After a number of continuances, in July 2012, the Agency recommended changing the permanent plan to adoption in order to provide Ella a permanent parent; appellant felt he could accept this if it was best for Ella and Kim remained committed to maintaining Ella's ties to her extended birth family. Ella began to verbalize a desire to live with appellant and he, Kim, and the child welfare worker (CWW) agreed to have Ella spend longer periods of time with him to help her understand what life would be like in his home. The following May, however, the Agency reported that Ella was ambivalent about

---

[2] Further statutory references will be to the Welfare and Institutions Code unless otherwise specified.

2

her placement, telling the CWW she " 'kinda does and kinda doesn't' " want to move to appellant's home and, although continuing to spend most weekends with appellant, choosing to stay with Kim more often than before. The Agency recommended that she remain in Kim's home. This recommendation remained the same in November 2013, when it was reported that Ella had "conflicted feelings about who she would like to live with on a permanent basis" and was "happy living with [Kim] but says she might like to live with her maternal grandfather." Also in November, appellant formally requested that Ella be placed with him.

In December 2013, Kim married and her new husband moved into her home. Kim had not obtained proper clearance before he moved in. Faced with losing her foster care license or having her husband move out, Kim chose to relinquish the license and pursue a "Non-Related Extended Family Member" home approval. The Agency prepared to move Ella to appellant's home, which it had approved for placement in January.

Conflict developed between Kim and appellant in early 2014, apparently due to an Emergency Response Referral in late February, when appellant called the Agency after Ella told him about what he believed was inappropriate conduct toward Ella by Kim's husband. Ella had been saying she wanted to live with appellant and the Agency had been evaluating this option, and Kim had responded by changing visitation plans and at times saying she wanted to stop Ella's visitation with appellant. Ella was very upset about the changes in visitation and expressed frustration that her wishes about placement were not being conveyed to the court. She told the CWW she had written a letter to the court asking to be moved to appellant's home; when the CWW asked Kim for the letter, Kim refused, but confirmed its existence and said she would give it to Ella's attorney.

After Ella's attorney sought a court order prohibiting a change in placement absent exigent circumstances or further court order, the Agency agreed a permanent change of placement would require a court order and the focus became visitation. By April, Ella appeared to have firmly decided she wanted to move to appellant's home and a plan was about to start under which Ella would spend alternating two-week periods with Kim during the week and appellant on weekends, then with appellant during the week and

Kim on weekends. The Agency intended the alternating two-week visitation plan to help determine whether the move would be in Ella's best interests.

In early June, the Agency again recommended continuing Ella's placement with Kim. Ella continued to say she wanted to live with appellant and gave the CWW another letter to the court stating this desire, saying she had written it because her original letter was missing. Her therapist, however, believed Ella's "primary parental attachment" was with Kim and severing it would cause emotional trauma. In the Agency's view, there was not a "clinically significant rationale for disrupting the primary attachment to her current caregiver" but adoption would not be appropriate because Ella was clearly attached to her biological family, severing that attachment would be detrimental, and "Ella thrived when both parties worked together to raise" her.

On June 5, appellant filed a "Request to Change Court Order" asking the court to rescind Kim's guardianship and make him Ella's legal guardian.

Over the next months, the Agency maintained its recommendation of continuing Ella's placement with Kim. In late June, Ella unexpectedly saw her mother for the first time since 2011 at a funeral for a biological relative. The CWW reported that afterward, Ella told the CWW she was fine despite being visibly agitated, then broke down and sobbed inconsolably in Kim's arms for nearly 45 minutes. Appellant later told the CWW that Ella was "fine" and her crying was not due to the interaction with her mother at the funeral but rather to not being able to move to his home. The CWW believed that the fact Ella did not cry with appellant but broke down with Kim "demonstrated where Ella feels safest despite her statements of wanting to live elsewhere," and saw appellant's remarks as indicative of a "lack of parental connection" that would have allowed the "vulnerable interaction" Ella had with Kim to take place with appellant. The CWW noted, "This example is also indicative of Ella's not fully understanding what it would mean for her to move and sever another parental connection."

In late August, the CWW reported that Ella's statements about wanting to live with appellant had ceased over the summer and she appeared "resolved" to living with Kim; the tensions between appellant and Kim had "subsided significantly," which had a

4

"profound" positive effect on Ella. The CWW reported in September that Ella appeared content to live with Kim as long as she had liberal visitation with her birth family and, based on observation of Ella in both homes, stated that it was clear Ella had a "deep parental attachment" to Kim. Kim had requested an adoption home study but the Agency viewed Ella as not adoptable because she said she did not want to be adopted by Kim. In October, the Agency advised that changing Ella's placement would not be in her best interest because "it would sever[] her primary parental connection and although she's attached to [appellant], that relationship is unharmed by Ella continuing to reside with her Legal Guardian."

An attachment evaluation conducted by Clinical Psychologist Deepa Abraham, filed with the court in October 2014, concluded that Ella was attached to Kim as her "primary caregiver" and recommended continued placement with Kim as offering "the most potential for emotional stability and psychological growth."

Appellant was granted de facto parent status in October. Kim appealed, and this court affirmed.

The hearing on appellant's request for change of guardianship and placement was set for December 2014. In the Agency's report for this hearing, a new CWW who had been assigned to the case at the end of September related her discussion with Ella about the court situation. Ella said she "wished there were two of her, one that could stay [at Kim's] and one that could live at her grandfather's house." Ella's therapist reported that Ella expressed feeling "torn and stuck in the middle between her 'mom' and 'grandfather,' " as well as concern that she might not have as much contact with her " 'mom' " if she lived with appellant. The Agency recommended that Ella remain in Kim's home, the visitation schedule with appellant be continued, and the dependency be dismissed.

The hearing began on December 4, then continued on February 25, 2015, and May 19, 2015. Testifying in camera, Ella said she felt very close to appellant, her grandmother and her Aunt S.S., who lived with them, and got along well with all of them. She felt comfortable and safe at appellant's house and liked to draw, watch TV, cook

5

with her grandmother and hang out with her Aunt S.S. At the family's other house in Manteca, she helped appellant work on his cars and rototill the garden. When she was upset at appellant, she talked to S.S., who felt like both an aunt and a sister; they talked about "everything." Ella testified that she wanted to live full time with appellant. Asked why, and whether there was something about Kim's house that she did not like, Ella said that before Kim's daughter and grandchildren moved out, one of the grandchildren was bullying her and that "made me want to go more." Ella called Kim "mom" or "mother."

S.S. testified that she and Ella had more of a sister relationship even though Ella was her niece, as they were "closer in age."[3] Ella was "very lively" and "a happy kid." She liked to cook and do arts and crafts with her grandmother and was "really close" to appellant; she used to talk more to S.S. but now talked more to appellant.

Appellant testified that he had been seeking full custody of Ella since he learned she existed. When he went to the Agency, he got "the runaround"; he was told there were procedures he had to go through, not allowed to see Ella and told she was "up for adoption." Two months later, at the first supervised visit, appellant was told he could not hug Ella or tell her who he was. When they first met, Ella looked at him and said she "knew he was her grandfather," and at subsequent visits she was "elated" to see him. The visits were supervised by the CWW until the Agency provided the paperwork for appellant to be live scanned and fingerprinted, the prerequisite to unsupervised visits, which happened around October of 2010. Once he was allowed unsupervised visits, he brought Ella home, she met her grandmother and S.S., and from that point on, she said she wanted to live with him.

Appellant testified that initially Kim was very open and he had a good relationship with her. Kim told appellant he was welcome to come to her church and spend time with Ella there, which appellant did. Prior to Kim's marriage, appellant would take her to lunch and they would talk about "what Ella was going through that we needed to work on," but after the marriage things changed. Appellant felt it was unfair that he had to go

---

[3] S.S. was a college student at the time of the hearing.

through "a whole barrage of scrutinization with the Agency" with very limited access to Ella, while Kim's husband had access to the child 24 hours a day from "day one," with no scrutiny by the Agency. Appellant became distressed and called the CWW after Ella, upset, told him that she did not have a door on her room, she had no privacy and the husband "was in a room laying on her." Appellant was not able to get any further information from the Agency after his phone call and did not know whether his complaints were investigated. When the Agency discovered Kim was in violation of her foster care agreement and license and was going to remove Ella and place her with appellant, appellant was elated at the prospect of finally having her with him.

Appellant testified that every time Ella was with him she would ask when he was "going to be able to move [her] with [him]." She would tell him that she had told her case worker, her therapist, her attorney and Kim and ask, "How many times do I have to say that I don't want to stay there? I want to live with you and they are not listening to me."

Kim's husband testified that he had a good relationship with Ella. He denied ever lying on top of her and described an incident when they were playing in the family room, with Kim present, Ella was on his back and he leaned back, "tickled her and told her to give and she said 'okay, I give.' " The husband testified that someone from the Agency came to the house saying they had received a call claiming he had acted inappropriately with Ella; the person spoke privately with Ella and did not ask him any questions about the incident, and "once the investigation was over, it was stricken off."

Kim testified that she learned about appellant while she was in the process of adopting Ella. Because appellant was angry with the Agency and there was a lot of tension, Kim decided to pursue guardianship to allow the Agency time to decide whether to place the child with her family. She supervised Ella's visits with appellant from around December 2009 until August 2010, when he was allowed unsupervised

visitation.[4]  Kim testified that Ella treated her husband as her father and always took his side if he and Kim disagreed on something.  Kim had participated in Ella's therapy sessions from the time Ella was three until she was around seven, when Kim encouraged her to go in by herself, and continued to attend occasionally at Ella's request.  Kim, her husband, and Ella participated in family therapy "to keep the lines of communication open and to just bond us together closer as a family."  Kim testified that Ella only brought up living with appellant when she was angry with Kim; she did not believe the statements in the Agency's reports that Ella had said she wanted to live with appellant and did not recall reading in the bonding study that Ella had been saying for two years that she wanted to live with appellant.  Testifying in May 2015, Kim said the last time Ella had mentioned wanting to live with appellant was in 2014.  She believed Ella wanted to stay with her and not live with appellant, and said Ella had told her several times that she liked living with her and spending time with appellant.  Kim felt Ella wanted "the best of both worlds," being able to enjoy both families.  Kim believed Ella needed to know "who her family is" and she intended to encourage visits between Ella and appellant's family.

In March 2016, the Agency filed a status review report stating its recommendation that Ella remain with Kim and the dependency be dismissed.  The CWW had spoken with Ella's therapist, who reported that since her in-chambers testimony, Ella no longer discussed her feelings about wanting to live with appellant.  The therapist stated that Ella's anxiety level had decreased and her current therapy sessions were "much more age appropriate in regards to upset about limits set on behaviors, school dynamics, and wanting more input on her weekend schedule."  When asked by the CWW how she felt about her current placement, Ella said, " 'I like it, it's OK.' "  Asked how she felt about appellant, she responded, " 'I still want to go there,' " but she did not elaborate when asked if she wanted to say anything more about this to the court.  The CWW "did not get any sense of emotion from Ella when she shared this comment."  Kim reported that Ella

---

[4] Appellant testified that his supervised visits were always supervised by the CWW, never by Kim.

had been regressing after visits with the CWW, calling Kim "mommy" rather than her more common "mom/mother," and that lately Ella had been asking Kim to tuck her in and sleep beside her. The CWW noted that while Ella had expressed desire to live with appellant, she "continues to thrive and present as quite happy in her present home." The CWW felt the issue of placement should be finally determined so "all parties can move forward and continue being two parts of Ella's whole family, as she clearly benefits from both sides." The CWW stated that appellant and Kim "were able to function in this manner quite successfully in the past and it is the assessment that they will return to that once placement is decided once and for all."

## DISCUSSION

Welfare and Institutions Code section 388, subdivision (a)(1), provides in pertinent part that "[a]ny parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court." "To support a section 388 petition, the change in circumstances must be substantial." (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.) Further, the petitioner must show that the proposed change would serve the best interests of the child. (*In re J.C.* (2014) 226 Cal.App.4th 503, 525; *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 529.) "The person who files a petition to change, modify or set aside a juvenile court order bears the burden of proof by a preponderance of the evidence the proposed change is in the best interest of the child." (*In re Michael D.* (1996) 51 Cal.App.4th 1074, 1083-1084 (*Michael D.*); *In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).)

"Whether the juvenile court should modify a previously made order rests within its discretion, and its determination may not be disturbed unless there has been a clear abuse of discretion." (*In re J.C., supra,* 226 Cal.App.4th at p. 525, quoting *Stephanie M., supra,* 7 Cal.4th at p. 318.) " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably

be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " (*Stephanie M.,* at pp. 318-319, quoting *Walker v. Superior Court* (1991) 53 Cal.3d 257, 272.)

In explaining its decision, the court stated that it was clear Ella was an exceptional, brilliant, caring and kind person, she loved both appellant and Kim, she wished to reside with appellant, both families provided her with loving and supportive environments and each family provided her a "unique and significant fulfillment." The court found that neither of the bases for appellant's motion—the breakdown of communication after Kim's marriage, which set a negative tone for the child, and the fact that Ella had been asking to live with appellant since she was five years old—constituted a changed circumstance, and that termination of the present guardianship would not be in Ella's best interests. Specifically, the court noted its concern over "severing yet another primary attachment bond with a mother figure" when Ella was clearly "still processing issues regarding her own biological mother.

Appellant argues that the breakdown in the relationship between him and Kim that occurred after her marriage was a change of circumstance that resulted in a reduction of Ella's visitation with him. Previously, from the time appellant entered the case, Kim had willingly facilitated frequent visitation. By April 2010, appellant was visiting with Ella almost weekly and beginning in August 2010, Ella spent three to four weekends a month with appellant. In July 2012, responding to Ella's stated desire to live with appellant, she had longer visits with appellant during the summer, then returned to weekend visits when school began. In late February 2014, however, Kim unilaterally decided to reduce the visits and expressed a desire to terminate them, and it was only with the assistance of the CWW that visits were resumed on a reduced schedule of every other weekend.

Respondent maintains that the breakdown in communication was at most a "*changing*" circumstance, which is not sufficient. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 49 [no abuse of discretion in denying petition where "circumstances were changing, rather than changed"].) Respondent points to the Agency's report in October 2014 that, after the acrimony between the parties, visitation had "resumed with some normalcy" and

that the families had "begun to reconcile their differences and [were] working together toward Ella's best interest despite their not agreeing on placement." In June 2014, through mediation, the parties had agreed to a schedule for visitation until the next court date in August; the Agency indicated in its April 1, 2015, status review report that Ella was with appellant every other weekend, with weekly visits during school vacations. Respondent asserts that while appellant "[n]o doubt" would have preferred more visitation, "there was no evidence of continued acrimony between him and Kim" "after a more concrete visitation schedule had been worked out."

Respondent's portrayal overlooks the fact that the resolution the parties reached was, apparently, on Kim's terms: Appellant lost considerable visitation time with Ella as compared to what he had prior to early 2014. Describing Kim's perception of her family's needs, the Agency's April 2015 report stated that Kim wanted "to get closure on the current placement issue and [to] be able to move forward in her caring for Ella in her home. She does not wish to return to mediation for a fourth time to discuss on-going visitation as she feels that she is being fair and liberal in the current arrangement with [appellant] with two weekends monthly in addition to weekly visits during school vacations." This description—Kim's feeling that she was being "fair and liberal" and the reference to a fourth round of mediation—suggests that appellant was not content with the reduced visitation he had been allowed since the difficulties between him and Kim arose in early 2014, and that the parties had not regained their prior ability to work out a mutually acceptable plan. Nevertheless, that appellant and Kim had agreed to a plan, albeit through mediation, and it appeared to be working, suggests the breakdown of communications appellant alleged as a changed circumstances did not remain as severe as when it arose in early 2014. In short, while it is apparent there had been a change in Kim's attitude toward the amount of appellant's visitation, neither the significance nor the permanence of this change were at all clear.

Appellant further argues that Ella's clear statement of desire to live with him was a change in circumstance. According to appellant, on March 5, 2014, after learning that Kim wanted to terminate visitation with appellant, Ella clearly stated she was ready to

11

move to appellant's home.  Since prior to this time Ella had been ambivalent about whether and when she wanted to change her placement, appellant views her clear statement, reiterated in a letter she wrote to the court in May, as a changed circumstance.

As respondent points out, however, Ella's statements about her living situation did not remain constant after March 2014.  In August, the CWW reported that Ella's statements about wanting to live with appellant had ceased over the summer and she appeared to be "resolved in continuing her life" at Kim's home; in September, the report was that Ella appeared to be content to live with appellant as long as she had liberal visitation with her birth family.  In October, the Agency related Ella's therapist's report that while Ella was "deeply conflicted when visitation nearly stopped," she had "found a new sense of calm since visitation has resumed and continued without issue" and Ella seemed to have "settled back into the stability of living with [Kim] and visiting with [appellant]."  In December, the Agency related Ella's therapist's statement that Ella had expressed some concern that she might not have as much contact with her " 'mom' " if she lived with appellant.  The therapist later reported that after Ella testified in December 2014, she stopped discussing her feelings about wanting to live with appellant.  In March 2015, when the CWW asked Ella how she felt about her current placement, she replied "I like it, it's OK."  Asked about appellant, Ella said "I still want to go there" but did not elaborate when asked if she had anything more to say about this to the court.  In our view, this record does not demonstrate a clear change from ambivalence to firmly stated desire to live with appellant but rather a constant desire to spend significant time with appellant, with much variation over time in the degree of certainty of Ella's desire to actually change her living situation.

In addition to the changed circumstances alleged in his petition, appellant urges that the Agency's January 2014 approval of his home for placement was a changed circumstance because the Agency had not previously evaluated his home, despite his repeated requests to have Ella placed with him.  Similarly, he argues that the Agency's decision in February 2014 to place Ella with him was a change in circumstances, although (by appellant's characterization) when Ella's attorney objected, the Agency

12

"back-peddled," recommending a 90-day transition place to assess the change in placement and then deciding after only a month that Ella should remain with Kim.

Respondent does not address these points. The record indicates that the Agency moved toward changing Ella's placement during the period after it learned Kim's husband had moved into her home without prior clearance from the Agency: Ella's attorney stated in a declaration filed on February 14, 2014,[5] that she had been informed by the CWW in early February that the Agency planned to move Ella to appellant's home because Kim's home was "no longer approved because of a change within the placement" and Ella had expressed her wish to live with appellant. The Agency's support for placement with appellant—at a point when a problem had emerged with regard to continuing the placement with Kim—may have been a change in that the Agency had not previously taken this position, but it was swiftly followed by a change back to recommending continued placement with Kim. We fail to see how this soon-retracted change of recommendation can be taken to constitute a significant change of circumstances justifying the setting aside of the existing guardianship more than a year later.

Moreover, we find no abuse of discretion in the trial court's determination that the change appellant sought would not be in Ella's best interests. "The 'best interest of the child' is an elusive guideline that belies rigid definition. Its purpose is to maximize a child's opportunity to develop into a stable, well-adjusted adult." (*Adoption of Michelle T.* (1975) 44 Cal.App.3d 699, 704.) One of the factors to be considered in evaluating the best interests of a child with respect to a change of placement is the strength of the child's relative bonds to the current caretaker and to the person seeking the change. (*In re Kimberly F.*, *supra*, 56 Cal.App.4th at p. 532.) While not dispositive, "the disruption of an existing psychological bond between dependent children and their *caretakers* is an extremely important factor bearing on any section 388 motion." (*Id.* at p. 531.)

---

[5] This declaration was filed in support of the request for a court order preventing the Agency from changing Ella's placement in the absence of exigent circumstances or a further court order.

13

Appellant expressly admits that when the section 388 petition was decided, Ella had been living with Kim for more than seven and a half years, that Ella had formed a primary attachment to Kim and viewed her as a mother figure, and that the clinical psychologist who performed the attachment evaluation found Ella's attachment to Kim was stronger than her attachment to appellant. This evidence clearly supports the trial court's decision.

Appellant argues, however, that contrary to the views of Ella's therapist and the psychologist who evaluated her attachments, the evidence shows Ella's attachment to him is more significant than her attachment to Kim. He urges that Ella has "consistently" stated she wants to live with him and not with Kim "[f]or as long as Ella has been old enough to voice her own opinion," and that she had to "resign" herself to the idea of living with Kim. He also argues that while Ella has been in therapy since the summer of 2012, by his characterization in order to adjust to various aspects of living with Kim,[6] she has "never required therapy to feel comfortable with [appellant] or to view [appellant], her grandmother and her [Aunt S.S.] as her family, or to feel very close to them." Appellant notes the close relationships Ella has with him, her grandmother and her aunt, and her reported statement that she considers appellant and his family to be her "real family," and argues that Ella does not consider Kim's children and grandchildren her family, is not close with them, and did not like it when any of them lived with Kim.

Unquestionably, Ella enjoys very close relationships with appellant, her grandmother, and her aunt—the Agency has never disputed this. But none of the factors appellant points to indicate the juvenile court abused its discretion in finding appellant had not demonstrated that a change of placement would be in Ella's best interest.

The Agency also has never disputed that Ella has repeatedly stated a desire to live with appellant. While such statements may be evidence of best interests, "a child's wishes are not determinative of his or her best interests." (*Michael D.*, *supra*, 51 Cal.App.4th at p. 1087.) In *Michael D.*, the five-year-old child had been living with his

---

[6] Appellant describes Ella being in therapy "first to assist her in adjusting to adoption by Kim, then to assist her through the placement squabbles and, finally, now with Kim and [Kim's husband] to 'bond [them] closer as a family.' "

grandmother under a guardianship established instead of pursuing a plan of adoption in order to allow the child and mother to "reintegrate." (*Id.* at p. 1079.) The mother had rehabilitated herself and there was no evidence living with her would not be in the child's best interest. (*Id.* at p. 1088.) The child testified that he wanted to live with his mother and visit his grandmother; at the end of a hearing when the grandmother requested to have the child spend the evening with her, he "spontaneously cried out he wanted to be with his 'Mommy' " and began to cry. (*Ibid.*) The juvenile court found it was in the child's best interest to be returned to the mother's custody. (*Id.* at pp. 1080-1081.) Affirming, the *Michael D.* court "agree[d] with the juvenile court that Michael's testimony and repeated spontaneous statements he 'wanted to live with Mommy' constituted powerful demonstrative evidence it would be in his best interest to allow him to do so." (*Id.* at p. 1087.)

Here, while Ella repeatedly stated she wanted to live with appellant, there *was* evidence that changing her placement would not be in her best interest. Ella's therapist believed that severing the child's "primary parental attachment" with Kim would cause emotional trauma. The therapist told the CWW that Ella had expressed concern that she might not have as much contact with "her 'mom' " if she lived with appellant, and felt "torn and stuck in the middle between her 'mom' and 'grandfather.' " Dr. Abraham, the attachment evaluator, related the therapist's report of Ella reflecting, " 'It is hard, they are the two most important people to me. I am stuck in the middle. It is really hard. I don't want anyone to be sad (referring to Miss Kim) or be mad (referring to [appellant]). It appeared to be 'exhausting for her, it is a lot of pressure,' according to [the therapist]." The therapist described Ella to Dr. Abraham as " 'ambivalent, feels she is loyal towards one family and disloyal towards the other.' " Based on clinical interviews with Ella, Kim and appellant; telephone interviews with the CWW and Ella's therapist; administration of a number of assessment tests; and observation of Ella with Kim and of Ella with appellant, Dr. Abraham concluded Ella was attached to Kim as her "primary caregiver" or "primary attachment figure," and described Ella's attachment to appellant as

15

"characterized by ambivalence."[7] Dr. Abraham concluded that continued placement with Kim had the "most potential for emotional stability and psychological growth" because of the nature of her attachment to Kim. The attachment report explained that according to research and theory, a "secure, reciprocal relationship with a caretaker" promotes emotional development, feelings of mastery over one's environment, "pro-social behaviors and interpersonal connectedness," and that Ella's early attachment to Kim gave Ella a secure relationship within which she had "increased her sense of mastery" and "strengthened her interpersonal relatedness," and which "helps her regain emotional equilibrium."

The conclusions of the attachment assessment are consistent with the Agency's reports that while Ella asked to live with appellant, she appeared to be happy living with Kim as long as she was also visiting frequently with appellant. Ella's periods of greatest distress, not surprisingly, appear to have been in early 2014, when tensions were high between Kim and appellant and Kim was threatening to refuse appellant visitation, and in late 2014, when the child faced having to testify in court.

Appellant's suggestion that Ella required therapy to assist her in bonding with Kim distorts the record. According to appellant, Ella began therapy in 2012 "to assist her in adjusting to adoption by Kim." According to the Agency's July 2012 report, therapy was reinstituted with a previous therapist not because Ella was exhibiting or verbalizing emotional distress but because she was "very connected to" Kim and Kim's extended family and also had "a very positive and consistent relationship" with appellant and other relatives, and "[w]hile there is no talk of a change of placement, it is anticipated that

---

[7] The evaluator noted that Ella "easily engages and disengages" from Kim; "is comfortable testing behavioral limits"; "makes an effort to structure situations and takes control"; and empathizes with Kim's feelings. The psychologist found that "Ella's attachment to [appellant] is characterized by ambivalence"; that she "responds to his controlling demeanor by being compliant, passive and non-assertive"; that she "tries to meet his expectations with 'perfect' behaviors"; and that she "gives in when he structures situations and exerts control over her actions." Ella described appellant "as inflexible, 'either his way or no way' "; she found him "engaging" and "challenging" was " 'bored' when he is away."

discussions about adoption may bring up conflicting emotions for Ella and it is hoped that therapy may help Ella address these concerns." In December, the Agency reported that after Ella began to express a desire to live with appellant in July, she was offered and accepted the opportunity to restart counseling "to help explore" whether she wanted to move. Ella's therapy at this time was thus a support offered to help her sort through the situation presented by her close relationships with both families, not a means to build a relationship with Kim. Her therapy during the period of "placement squabbles" says much about her need for consistency, regular contact with appellant and peaceable relations between Kim and appellant, but little about the nature and degree of her relative attachments to appellant and Kim. And it is difficult to comprehend how participation in family therapy with Kim and her new husband "to keep the lines of communication open and just bond us together closer as a family" can be seen as reflecting poorly on the bond between Ella and Kim as opposed to a means of integrating what had previously been Kim's separate relationships with Ella and with her husband.

The record also does not support appellant's description of Ella's absence of connection with Kim's extended family: As mentioned above, the Agency in 2012 noted that Ella was "very connected to [Kim] and her nuclear and extended family." The Agency reported in June 2015 that Ella "has a huge supportive network that includes biological family as well as her Legal Guardian's family, who she considers to be her 'aunts, cousins,' etc. as well." Ella did not like it when Kim's daughter and granddaughters were living in Kim's home, apparently because of difficulties between Ella and one of the other children,[8] but this was a temporary situation and does not

_____

[8] After appellant raised concerns about Kim's older granddaughter bullying Ella, the CWW discussed the situation with Ella and Kim. Ella said that on "about" two occasions the granddaughter told Ella to carry her backpack and although Ella knew she could refuse, she knew the other child would get upset. Ella said she "didn't really feel like she was being bullied" but agreed to tell Kim if she felt bullied. Kim later said the girls had been having fewer conflicts and Ella also said things were better. When Ella testified in December 2014, asked why she wanted to move to appellant's home and whether there was something about Kim's house that she did not like, Ella said that

17

justify appellant's statement that Ella "absolutely did not like it when any of [Kim's children and grandchildren] moved in with Kim." In the May 2013 report in which the Agency discussed Ella's "strained connection" with the older of the two granddaughters then living with Kim, it also reported that Ella had "a close connection" to the other granddaughter. And Ella's referring to appellant's family as her "real" family does necessarily demonstrate anything about where her best interests lie.[9] Most important, while Ella's sense of connection to each of the extended families is relevant, the critical and determinative point in this case is Ella's relationship with Kim.

In sum, ample evidence supported the juvenile court's stated concern with disrupting Ella's relationship with another mother figure and conclusion that appellant had not met his burden of demonstrating a change of placement would be in the child's best interests. We do not find it necessary to resolve the parties' dispute as to whether appellant was required to make this showing by clear and convincing evidence or simply by a preponderance of the evidence.[10] The juvenile court found appellant had not met even the lesser standard and we find no abuse of discretion in this determination.

---

before Kim's daughter and grandchildren moved out, one of the grandchildren was bullying her and that "made me want to go more."

[9] Some context for Ella's reference to appellant's family as her "real family" may be suggested in the attachment evaluation. Dr. Abraham related Kim's description of Ella being very upset when she realized that other foster children in Kim's home had families they would visit on weekends; one of the foster children teased Ella for not having a family, and Ella would ask "why she had 'no real family.' " "On her first visit with her maternal grandfather, 'her face lit up, she was so excited. It made a world of difference to have a family to go to,' narrated Kim."

[10] Respondent argues that appellant was required to show clear and convincing evidence that it would be detrimental to Ella for her to remain in Kim's home. The argument is based on rule 5.570(h)(1)(A) of the California Rules of Court, which provides that when a section 388 motion seeks "removal of the child from the child's home, the [petitioner] must show by clear and convincing evidence that the grounds for removal in section 361(c) exist." (*In re Michael D., supra,* 51 Cal.App.4th at p. 1084 [discussing former rule 1432, renumbered rule 5.570 in 2007].) Section 361, subdivision (c), provides that a dependent child "shall not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of"

18

## DISPOSITION

The order is affirmed.

 

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Miller, J.

---

one of the enumerated grounds for removal.  Respondent maintains that the clear and convincing standard applies here because appellant sought to remove Ella from the home of her legal guardian.

*Michael D.* held that a parent's burden of proof to modify a permanent placement plan is preponderance of the evidence, even if granting the petition would result in termination of a "legal guardianship conditionally established while the child was a dependent of the juvenile court." (*Michael D.*, *supra*, 51 Cal.App.4th at p. 1086.)  As appellant points out, *In re A.H.* (2013) 219 Cal.App.4th 1379, 1392-1393, held that while minors "cannot be removed from their parents or predependency guardians pursuant to a petition under section 388 without a finding of detriment based on clear and convincing evidence[,] . . . [w]hen a minor is in the custody of a person who is *not* the minor's parent or predependency probate guardian, the juvenile court may grant a section 388 petition to change a minor's placement based solely on the best interest of the minor, and need not find that the current placement is detrimental."

As we have said, having concluded appellant failed to meet his burden of proving that the requested change of placement was in Ella's best interests, we need not resolve this dispute as to whether a finding of detriment would be required here, where a nonparent was seeking removal of a child from the home of a legal guardian appointed during a dependency proceeding.

19